## City of Louisville v. Figg Company, et al.

(Decided February 28, 1913.)

Appeal from Jefferson Circuit Court,

(Chancery Branch, First Division.)

Streets—Contract for Reconstruction of Street—Guaranty of Contractor
—Action Upon Guaranty—Finding of Chancellor.—In an action by
appellant against a contractor and his surety, in which a judgment
is sought on a guaranty for certain street construction, it being
agreed that should it be the opinion of the court that it is the
duty of the appellees to remedy the admitted defects done under
contract with the city, they will proceed to do so under the super-
vision of the Board of Public Works, and pay costs of the action;
but that should it be determined that appellees were not required
to remedy the defects, the action should be dismissed at appellant's
costs, Held:   That the finding of the chancellor is concurred in
that the condition of the street is due to expansion of materials,
that under the specifications no other result could have been rea-
sonably expected, and the city failed to show that appellees in any
way failed to live up to the specifications.

STUART CHEVALIER and PENDLETON C. BECKLEY, for ap-
pellant.

WILLIAM FURLONG and FURLONG, WOODBURY & FURLONG,
for appellees.

OPINION OF THE COURT BY JUDGE TURNER—Affirming.

This is an equitable action by the City of Louisville
against appellee, L. R. Figg Company, and its surety,
W. H. Bowser, wherein judgment is sought against them
on a guaranty executed in 1910.

It is, in form, an agreed case submitted to the court
under section 637 of the Civil Code, it being agreed in
the petition that should the court be of opinion that it
is the duty of appellees under their guaranty to remedy
the admitted defects in the work which they did under
contract with the city, they will proceed to do so under
the supervision and direction of the Board of Public
Works and pay the costs of the action; but that if it
should be determined that appellees were not required
to remedy the defects in said work, the action should
be dismissed at the costs of the city.

In 1910 the parties entered into a written contract for
the reconstruction of Seventh street in the City of Louis-
ville between Walnut and Chestnut streets, with vitrified
brick; carefully prepared specifications as to the material

to be used, and the manner in which the work was to be done were made a part of the contract, and it further provides:

"The party of the second part hereby guarantees the work done under this contract, and the materials used in the construction of the same, are free from defects or flaws, and this guarantee is for a term of five years from and after the acceptance of the work by the Board of Public Works. It is hereby especially agreed. and understood that this guarantee shall not include any repairs made necessary by any cause or causes other than defective work or materials in the construction of the improvement."

All parties agree that the street so reconstructed by appellees is now in a dilapidated and defective condition and badly in need of repair or reconstruction; it is admitted by appellant that the bricks, cement and sand used in the work were up to the specifications.

It is the contention of the city that the defective condition grows out of bad workmanship or imperfect preparation of materials on the part of appellee; while it is the contention of appellee that the defective condition grows out of the manner in which they were required by the specifications to do the work. The only direct evidence in the record as to whether these specifications were strictly followed is given by L. R. Figg; and while it appears throughout the record that numerous inspectors and representatives of the city including the City Engineer and Assistant City Engineer carefully supervised and looked over the work, some of them being present at all times, no one of them is introduced as a witness, except the City Engineer himself, who of course was only present for a short time each day while the work was in progress, and who testifies to no single fact which came under his personal observation showing that the specifications were not strictly adhered to.

Many expert witnesses were introduced by both sides, some of them learned and experienced as to the construction of vitrified streets, and as might be expected, their evidence, based upon hypothetical questions, is in some respects very conflicting.

Most of the expert testimony of the city was directed at proving that the cement grout or filler which was required to be used after the bricks were laid, was not properly mixed or applied as required by the specifications;

that if it had been both properly mixed and applied, it would have gone down in between the bricks and cemented them together so as to form after it was firmly set a solid monolithic mass, which would have had ample strength to resist any expansion.

The preparation and manner of applying this grout filler were prescribed in minute detail in the specifications, and appellees' evidence shows strict compliance therewith; the City Engineer himself, who was present part of the time when the same was being prepared and applied, says that it was done in accordance with the specifications while he was present. The burden of the city's complaint is that this grout or filler was not prepared or applied in such manner as to fill the cracks between the bricks down deep enough; but that by reason of its imperfect preparation or application, in many places it only went down one-quarter or one-half inch from the top of the bricks, and did not therefore, after it was set, make a strong or solid monolithic mass, whereas, if it had been properly prepared and applied, it would have gone down in between the bricks to the bottom, or near the bottom, and would in that way after being set, have composed a solid and practically indestructable street.

It is true that many of the bricks taken from the street disclosed that this grout or filler only went down a short distance between them, but appellees contend that that condition did not grow out of the manner in which the grout was prepared or applied, but grew out of the fact that under the specifications after the brick were laid on a loose layer of sand two inches thick, they were required to be rolled in such manner, and to such extent, and with such weight, as to force the sand up between the cracks in the bricks and for that reason the grout could descend only until it met the sand.

In support of this view they refer to section nine of the specifications, which is as follows, to-wit:

"After the blocks in the pavement are inspected and surface is swept clean of spawls, the pavement shall be well rolled with a five (5) ton steam roller in the following manner: The blocks next the curb shall be tamped with a band wood tamper to the proper gutter grade. The rolling shall then commence near the curb at a very slow pace and continue back and forth until the center of the pavement is reached, then begun at the opposite curb

and repeated in the same manner to the center of the carriage-way. After this first passage of the roller the pace may be quickened and the rolling continued until each block is firmly imbedded in the sand cushion. The roller shall then be started at the end of the block and the pavement rolled transversely at an angle of forty-five (45°) degrees to the curb; then the rolling shall be repeated in like manner in the opposite direction. Before this transverse rolling takes place all broken or injured blocks shall be taken up and replaced with perfect ones.''

It is altogether reasonable that with this enormous weight rolling over and over the bricks after they were laid on the cushion of loose sand, that the pressure would cause the sand to come up between the cracks in the bricks some considerable distance.

The evidence discloses that some time after the completion of this work when vehicles would pass along the street, there would be a rumbling sound as if they were passing over a cistern or cavity of some kind, thereby tending to show that the expansion had caused the bricks to buckle or raise from the concrete foundation, and that heavy traffic over it while in that condition would break and shatter the bricks; this was clearly one of, if not the chief cause of the imperfect condition of the street. The evidence is ample that this is a natural result where no provision is made for such expansion and contraction.

The specifications provided for expansion cushions on each side of the street next to the curbs, and prescribed its composition and dimensions; but no provision is made whatever for an expansion cushion lengthwise of the street, and the witness, L. R. Figg, states that on many occasions during the progress of the work, he notified the City Engineer and the city officials that there ought to be expansion cushions every fifty or seventy-five feet lengthwise of the whole work which was 744 feet long.

It is in evidence that the temperature in the City of Louisville varies 120 or 130 degrees at different times of the year, and it is perfectly manifest from a common-sense view that these extremes of temperature should in some way be provided for in the construction of such work.

The chancellor below evidently from his opinion in

the record gave careful and conscientious study to all this voluminous testimony, and we fully concur in his finding of fact that the condition of Seventh street was primarily due to the expansion of the materials with which it was paved, and that under the specifications no other result could have been reasonably expected, and that the city has failed to show that appellees in any way failed to live up to the specifications.

Judgment affirmed.